IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOSEPH J. GREEN, SR.,         )     CASE NO. 1:15CV1939
                           )
        Plaintiff,      )
                           )
     v.               )
                           )     MAGISTRATE JUDGE
                           )     KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL     )
SECURITY ADMINISTRATION,    )
                           )     **<u>MEMORANDUM OPINION & ORDER</u>**
        Defendant.    )

Plaintiff Joseph Green, Sr., ("Green") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 18.

As set forth more fully below, the Administrative Law Judge's ("ALJ") analysis of Green's treating physician's opinion was faulty and not in compliance with the applicable regulations. Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

On March 26, 2013, Green protectively filed an application for DIB, alleging a disability onset date of February 23, 2013. Tr. 20, 170. He alleged disability based on the following: low back pain, degeneration of lumbar, lumbosacral intervertebral disc, joint pain disorder, disorder of bursae and tendons in shoulder region, neuropathy, diabetes, high blood pressure, sleep apnea, cluster headaches, skin inflammation, migraine, lipoprotein deficiency, hyperlipidemia, and nasal

Case: 1:15-cv-01939-KBB  Doc #: 19  Filed:  06/13/16  2 of 26.  PageID #: 982

CPAP.  Tr. 174-175.  After denials by the state agency initially (Tr. 87) and on reconsideration (Tr. 104), Green requested an administrative hearing.  Tr. 121-122.  A hearing was held before ALJ Susan Giuffre on February 19, 2015 (Tr. 38-70).  In her April 2, 2015, decision (Tr. 20-32), the ALJ determined that Green could perform jobs that exist in significant numbers in the national economy, i.e., he was not disabled.  Tr. 31.  Green requested review of the ALJ's decision by the Appeals Council (Tr. 9) and, on July 22, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Green was born in Puerto Rico 1964 and attended high school there.  Tr. 30, 43.  He was 48 years old on the date his application was filed.  Tr. 30.  He previously worked as a welder for eleven years.  Tr. 44.

### B.  Relevant Medical Evidence

On January 17, 2012, Green attended a follow up appointment with pain management physician M. Andrew Greenwood, M.D., for right shoulder girdle pain.  Tr. 369.[1]  Green stated that he had right arm numbness and could not lift his right arm since March 2011, when he had an MRI and was sedated and positioned for two hours with his arm over his head.  Tr. 369.  Prior radiology studies were reviewed, including an NCS/EMG study in April 2011 which revealed right axillary neuropathy with mixed demyelinating and axonal features with signs of active denervation; possible right C5 radiculopathy; and moderate median sensorimotor neuropathy in his right wrist.  Tr. 370.  A right shoulder x-ray in March 2011 revealed osteoarthritic changes

---

[1] Green's brief does not comply with the spacing requirements set forth in the Initial Order.  *See* Doc. 6, p. 3, ¶4 ("the main text of all documents shall be at least 12-point, double-spaced non-condensed type ("non-condensed type" referring either to Times New Roman type or to another type that has no more than 80 characters to a line of text")).  Counsel is warned that failure to comply with this requirement in future filings will result in the Court striking any non-compliant filings.

2

and an MRI of his left shoulder revealed a full-thickness tear of the anterior supraspinatus tendon, which was not significantly changed from a prior MRI taken on 2006, although there was some progression.  Tr. 370.  Dr. Greenwood recommended Green continue physical therapy and noted that Green's clinical presentation and examination were consistent with symptomatically improving right auxiliary neuropathy and persistent right shoulder impingement.  Tr. 374.  He also ordered additional x-rays.  Tr. 374.

An x-ray of Green's right shoulder taken on February 15, 2012, revealed moderately severe degenerative changes of his right acromioclavicular joint with joint space narrowing and bony spurring.  Tr. 378.

On November 23, 2012, Green returned to Dr. Greenwood for a follow up visit.  Tr. 311-316.  He reported some improvement in his right lateral epicondyle pain after receiving an injection but he was still experiencing soreness when attempting to grip.  Tr. 312.  He had burning pain in his right arm and shoulder that was worse after completing a work day but not as bad after rest.  Tr. 312.

On December 27, 2012, Green underwent a NCS/EMG study of his right upper extremity with Shu Que Huang, M.D.  Tr. 299-301.  The study showed "electrodiagnostic evidence of right axillary and radial nerve lesion that make one considered [sic] incomplete right posterior cord of the brachial plexus injury.  Lack of significant chronic neuropathic changes is unusual."  Tr. 300.  There was mild to moderate right median sensory motor mononeuropathy across Green's wrist with no evidence of membrane instability; with his history of carpal tunnel release and in comparison with his prior EMG, Dr. Huang concluded that there was no significant interval worsening of median neuropathy.  Tr. 300.  There was no electrodiagnostic evidence of right ulnar neuropathy or cervical radiculopathy.  Tr. 300.

On February 5, 2013, Green reported to Dr. Greenwood that he was sore all over at the end of the work day after performing regular job duties.  Tr. 281.  He complained of burning pain in his right arm and shoulder with stiffness and achiness in his neck, low back, hip and shoulder girdle.  Tr. 281.  He was taking oxycontin, prescribed from his primary care physician Douglas Van Auken, M.D., with some benefit and also reported "some help" using lidocaine ointment and relief of his lateral elbow pain after an injection.  Tr. 281.  Upon examination, Green had slight weakness in his right wrist extension, tenderness in his lumbar paraspinals, decreased range of motion in his cervical spine, and tenderness in his right shoulder.  Tr. 284-285.  Dr. Greenwood remarked that the clinical presentation on examination was consistent with neck, back and right shoulder pain with neuropathic pain features.  Tr. 285.  He refilled Green's lidocaine ointment and an "increase to Pamelor."  Tr. 285.  He recommended Green stop working for 4-6 weeks and attend concurrent formal physical therapy for, among other things, postural training and core stability.  Tr. 285.  He also referred Green to Dr. Brendan Astley in pain management for consideration of additional procedures.  Tr. 285.

On March 27, 2013, Green saw Matt J. Likavec, M.D., for a spine consultation regarding possible surgery.  Tr. 265-270.  He was referred by Dr. Van Auken based on his complaints of worsening low back and right leg pain.  Tr. 265.  Dr. Likavec noted Green's history, including an MRI taken on January 10, 2013, showing "what appears to be [] chronic L1/2 and L2/3 disc herniations with compression of the fecal sac."  Tr. 266.  Green also had a small disc bulge at L5-S1 with minimal compression of his left neural foramen without right sided pathology.  Tr. 266.  Upon examination, Dr. Likavec found no localized weakness.  Tr. 270.  He opined that Green had a non-surgical back condition and recommended he continue with conservative management and epidural injections.  Tr. 269-270.

On May 24, 2013, Green underwent bilateral L3, L4 and L5 lumbar medial branch blocks.  Tr. 241.  On June 2, 2013, Green saw Dr. Van Auken, reporting that he was very discouraged because he had to stop working and he believed that his pain in his shoulders and back was so great that he did not think he could continue to work.  Tr. 246.  He was accompanied by his wife, who explained that this has been coming for a long time and that they were trying to prepare for it.  Tr. 246.  Green and his wife felt that if Green's pain could be better controlled "at least that would help him cope."  Tr. 246.  Upon examination, Green had a decreased range of motion and many muscle groups were painful, most of which corresponded to his degenerative joint disease or to tendon tears or nerve injury.  Tr. 248.  Dr. Van Auken increased his pain medication, switching him to MS Contin/Vicodin after learning that oxycontin was not covered by Green's new insurance.  Tr. 248.  He considered the possibility that Green could have a rheumatologic condition and referred him to an arthritis clinic.  Tr. 248-249.

 On June 21, 2013, Green underwent a second bilateral L3-L4 and L5 lumbar medial branch block.  Tr. 440.

On June 27, 2013, Green saw Brendan Astley, M.D., reporting that his back pain was constant and throbbing and he had burning-type pain in his shoulders.  Tr. 430.  Green reported that the two lumbar blocks he received helped for approximately two to three days and then his pain returned.  Tr. 430.

An x-ray of Green's lumbar spine on July 15, 2013, revealed mild multi-level degenerative disc disease throughout his lumbar spine; "additional changes probably reflecting spondylosis deformans are seen in the thoracolumbar junction."  Tr. 437.  He also had moderately severe disc space narrowing at the L5-S1 level.  Tr. 437.

On July 17, 2013, Green saw Stanley Ballou, M.D., at the arthritis clinic.  Tr. 426-427. Upon examination, Dr. Ballou observed that Green ambulated without difficulty.  Tr. 427.  He had a patch of psoriasis on his anterior chest, mild tenderness in both wrists, mild diffuse tenderness in his elbows, frozen shoulders, and a limited range of motion in his cervical spine. Tr. 427.   Dr. Ballou remarked that frozen shoulders are not uncommon in patients with diabetes like Green.  Tr. 427.   He observed that Green will be getting shoulder injections and that these injections, followed by intensive physical therapy, are the appropriate choice for bilateral shoulder pain and limited mobility.  Tr. 427.  He noted that radiographic features suggested the possibility of psoriatic spondyloarthropathy, which may have contributed to Green's bilateral shoulder pain and adhesive capsulitis.  Tr. 427.

On July 19, 2013, Green had a lumbar medial branch radiofrequency rhizotomy. Tr. 419.  He also had an MRI of his cervical spine.  Tr. 424-424.  The MRI showed congenital spinal canal stenosis with multiple levels of degenerative disc disease and calcification of his posterior longitudinal ligament resulting in severe compression of his spinal cord and resulting edema and encephalomalacia.  Tr. 424.  Enhancement of his C6-7 disc was suspicious for early discitis.  Tr. 424.  A CT of his cervical spine on July 20, 2013, revealed advanced multi-level spondylosis, extending from C3 through the upper thoracic region to at least T3, and marked spinal cord compression was present, especially severe at the C5-6 level.  Tr. 462.

The following day, Green underwent surgery for a C5-6 fusion due to a C5-6 herniated disc and possible C6-7 discitis.  Tr. 408.  A hemicorpectomy of C6 was also performed to relieve the spondylosis.  Tr. 408.  The surgery did not reveal evidence of diskitis, osteomyelitis, epidural abscess or any type of infection.  Tr. 410.

6

On August 27, 2013, Green returned for a post-op check-up.  Tr. 509-510.  He was doing "okay" but still hand right arm cramping.  Tr. 510.  He was advised to perform home exercises and to walk as tolerated.  Tr. 510.

On December 9, 2013, Green saw Dr. Van Auken.  Tr. 619.  Green's range of motion in his neck was reduced but still functional.  Tr. 619.  He asked Dr. Van Auken to follow up on lab reports to consider inflammatory arthritis.  Tr. 619.  Dr. Van Auken stated that the overall picture of arthritis is more extensive than might be expected from overuse at a factory job for many years.  Tr. 620.  Upon examination, Green was tender across his supraspinitis muscles, had a reduced range of motion in his neck and bilateral shoulders, and had a spasm in his lower back.  Tr. 623.  Dr. Van Auken referred Green to the arthritis clinic to determine if there could be any additional relief for his chronic pain.  Tr. 624.

On January 28, 2014, Green returned to Dr. Ballou at the arthritis clinic. Tr. 641.  Dr. Ballou noted that Green ambulated without difficulty and appeared depressed.  Tr. 641.  He still had a patch of psoriasis on his chest.  Tr. 641.  He had a painful and limited range of motion in both shoulders.  Tr. 641.  His wrists and elbows were asymptomatic.  Tr. 641.  Dr. Ballou opined that it was possible that Green has spondyloarthropathy and shoulder pain related to psoriatric arthritis or, alternatively, chronic subdeltoid bursitis, which is common in diabetes patients.  Tr. 641.  He gave Green a Kenalog and Lidocaine injection in each shoulder and referred him to physical therapy.  Tr. 641.

On March 3, 2014, Green returned to the arthritis clinic and saw Songqian Li, M.D.  Tr. 648-650.  He reported that his shoulders felt better after the injections and that his pain had resolved. Tr. 648.  He was still experiencing pain and stiffness in his low back, hip and arm, but he felt better after moving for a few hours.  Tr. 648.  Upon examination, his right shoulder had a

7

full range of motion with no swelling, tenderness or warmth.  Tr. 649.  His left shoulder range of motion was limited to abduction to 90 degrees.  Tr. 649.  He had full range of motion in his hips, elbows and wrists with no pain, swelling or warmth.  Tr. 649.  An x-ray of his hips was normal.  Tr. 649.  Dr. Li advised him to continue his physical therapy.  Tr. 650.

On May 28, 2014, Green saw Dr. Astley complaining of thoracic pain that was constant, sharp, and aching and worsened with prolonged sitting and standing.  Tr. 699.  Upon exam, Green had tenderness over the paraspinal muscles and positive straight leg raising.  Tr. 702.  Dr. Astley reinforced the importance of back protection and a regular program to improve strength and flexibility.  Tr. 703.  He scheduled him for caudal injections, which had helped him the most in the past.  Tr. 703.

On June 13, 2014, Green saw Nurse Todd Markowski at pain management.  Tr. 747.  Green reported sharp continuous pain radiating to both legs made worse by walking.  Tr. 747.  He was taking Oxycontin.  Tr. 747.  Upon examination, Green had positive vibratory sensation in his bilateral upper extremities and bilateral lower extremities; he also had full muscle strength in his upper and lower extremities.  Tr. 748.  Green informed Markowski that he would not undergo caudal blocks unless he could have general anesthesia, because of pain and anxiety, which Markowski told him was not possible.  Tr. 749.  Therefore, Markowski scheduled Green for a bilateral lumbar medial branch block at L3-4 and L4-5.  Tr. 749.

On June 27, 2014, Green underwent a bilateral L3, L4 and L5 branch block; he did so again on July 25 and August 8, 2014.  Tr. 756, 773, 781.

On August 13, 2014, Green presented to the emergency department reporting that he had stopped all narcotic medication because his pain had improved after his back injection and that he was experiencing chills, nausea, diarrhea, body aches and abdominal cramps.  Tr. 787.  He

was treated for withdrawal and advised to follow up with Drs. Astley and Van Auken to establish a plan for pain medication.  Tr. 788.

On August 16, 2014, Green saw Dr. Van Auken and reported that chronic pain and depression were overwhelming him.  Tr. 762.  He could not do anything physical because of back pain.  Tr. 762.  Due to his inability to work, his family was suffering financially and Green considered suicide.  Tr. 762.  Green stated that he was considering taking something for his depression to see if it helped.  Tr. 765.  Dr. Van Auken refilled Green's pain medication and prescribed Celexa for his depression.  Tr. 765.

On August 18, 2014, Green presented to the Center for Families and Children with a referral from Dr. Van Auken for treatment of depression.  Tr. 588.  Green expressed feeling unmotivated without a desire to continue living. Tr. 588.  He had been experiencing daily severe symptoms of depressed mood for the past one and a half years.  Tr. 588.  He was diagnosed with Major Depressive Disorder, single episode, severe without psychotic features and opiate dependence.  Tr. 606.

On October 3, 2015, Green underwent a psychiatric evaluation.  Tr. 608-611.  He was assessed with severe depression, partly due to pain, not being able to work and financial problems and diagnosed with major depressive disorder, single episode, severe without psychotic features, opiate dependence and adjustment disorder with mixed disturbance of emotions and conduct.  Tr. 610.  He was assigned a Global Assessment Functioning ("GAF") score of 56.[2]  Tr. 611.

---

[2]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id*.

On October 11, 2014, Green reported to Dr. Van Auken that he was weaning himself off narcotics and was going to have to learn to live with his pain.  Tr. 825.  He was doing a little better since he stopped working because he was not under constant strain, but he was still challenged by how much he depended on others to do things because he could not carry much or do yard work.  Tr. 825.  He was feeling a little better after having been on Celexa.  Tr. 825. Upon exam, he was smiling, relaxed and calm.  Tr. 827.  He had a reduced range of motion in his neck and right upper extremity.  Tr. 828.  He had tension at his paraspinal muscles in his low back and his gait was careful but steady.  Tr. 828.

### C.  Medical Opinion Evidence

#### 1.  Treating Source Opinion

On August 26, 2013, Dr. Van Auken completed a physician questionnaire one month after Green's cervical fusion surgery.  Tr. 503-504. He reported that Green suffered from constant pain in his neck.  Tr. 503.  He also had pain in his shoulders, low back and right leg.  Tr. 503.  Dr. Van Auken opined that Green must change his position every thirty minutes or less and could stand or walk two hours in an eight-hour work day with many interruptions.  Tr. 503. Since Green's neck surgery, the heaviest weight Green could lift occasionally was "almost none." (Emphasis in original)  Tr. 504.  He would need unscheduled breaks every twenty minutes or less and he was expected to miss 30 days in a typical month.  Tr. 504.  He also had fatigue, poor balance because of neuropathy in his leg, and cluster headaches twice a day.  Tr. 504.  Dr. Van Auken opined that Green has a widespread musculoskeletal disease and it was unlikely that he would recover enough to perform any physical work place activities.  Tr. 504.

On December 4, 2014, Dr. Van Auken completed a Medical Source Statement ("MSS"). Tr. 845-848.  He noted that Green had been a regular patient for 20 years.  Tr. 845.  He opined

that, if Green were placed in a competitive work situation, he would be limited to occasionally lifting and carrying 10 pounds and occasionally handling, grasping and fingering.  He could stand for 15 minutes at a time without interruption for a maximum of one hour total; walk for 15 minutes at a time without interruption for a maximum of one hour total; and sit for five minutes at a time without interruption for a maximum of two hours but that he must change position constantly.  Tr. 846.  Green would be off task more than twenty-five percent of the day and would have cluster headaches twice a day and back or shoulder pain twice a day depending on the task.  Tr. 846.  Dr. Van Auken opined that Green's arthritis and musculoskeletal injuries would progress if he were placed in a competitive work environment and that he had a risk of injury due to poor balance, poor strength, and gait abnormalities.  Tr. 847.  In a work situation, Green's pain would worsen with over three hours of work and he would require three days to recover.  Tr. 847.  Attached to the questionnaire, Dr. Van Auken included a description of each of Green's diagnoses and resulting symptoms.  Tr. 848-850.  Dr. Van Auken reported that Green's obstructive sleep apnea was worse because of abnormal positioning of his neck post-op; he had pulsing pain in his neck and arthritis in both shoulders; he had shooting pain with movement in his low back to his left buttock and electric-like pain to his left foot, and sometimes similar pain, but less intense, on the right side; and he got cluster headaches about twice a day which lasted 30 minutes without oxygen and 15 minutes if Green used oxygen.  Tr. 849. Overall, Green had poor balance, could only go up and down stairs one step at a time due to left leg weakness and pain, and "has so many parts of the body affected by arthritis/surgery etc that there is no task that is not compromised."  Tr. 849.

On December 5, 2014, psychiatrist Eduardo D. Vazquez, M.D., completed a

mental residual functional capacity ("RFC") assessment.  Tr. 875-877.  Dr. Vazquez reported that he had seen Green on October 3, 2014, and that he would be seeing him every six to eight weeks for medication adjustment.  Tr. 875.  He stated that Green was diagnosed with major depression and that he had significant problems with pain which caused significant changes in his life that were related to his depression.  Tr. 875.  These factors make his ability to work minimal and unpredictable from day to day.  Tr. 875.  Dr. Vazquez estimated that Green would be off task more than twenty-five percent of a workday, would be absent over ten days per month, and would be unable to function over twenty-five percent of the time that he was at work.  Tr. 875-876.  He had moderate to extreme limitations in his ability to perform all work-related activities.  Tr. 876.  Dr. Vazquez opined that these limitations began two years ago.  Tr. 877.

### 2. Consultative Examiner

On June 13, 2013, Green saw psychiatrist David V. House, Ph.D., for a consultative examination.  Tr. 382-387.  Dr. House observed that Green had difficulty maintaining focus and seemed preoccupied with his physical health, explaining, "it appears that a good portion of his emotional condition is related to his physical health" and opining that his emotion health issues would therefore be chronic as long as his physical health issues were chronic.  Tr. 385, 387.  Dr. House diagnosed Green with mood disorder which "appear[ed] to be serious" and post-traumatic stress disorder that produced mild to moderate symptoms.  Tr. 386.  He opined that Green had an intact long term memory, "perhaps" a moderately limited short term memory, and he could follow instructions.  Tr. 386.  He had no more than a moderate reduction in his ability to concentrate and he could follow multi-step directions; he was also "rather socially isolated at this time" but had no major history of negative interaction with others.  Tr. 386.  Dr. House opined

12

that Green "would be disruptive and dysfunctional in a work environment and likely would not show up." Tr. 387. He assigned Green a GAF score of 45.[3]

### 3. State Agency Reviewers

On June 18, 2013, state agency physician Gerald Klyop, M.D., reviewed Green's record. Tr. 78-81. Regarding Green's physical RFC, Dr. Klyop opined that Green is capable of light work but limited to frequent pushing and pulling with his right upper extremity and frequent handling and overhead reaching with his right upper extremity. Tr. 79-80.

On September 16, 2013, state agency physician Teresita Cruz, M.D., reviewed Green's record and affirmed Dr. Klyop's opinion. Tr. 96-98.

On July 3, 2013, state agency psychologist Kristen Haskins, Psy.D., reviewed Green's file. Tr. 81-83. Regarding Green's mental RFC, Dr. Haskins opined that Green could follow multi-step, but not complex, directions. Tr. 82. He could superficially relate to others, his coping skills were limited, and he would do best in a static setting. Tr. 83.

On August 16, 2015, state agency psychologist Bruce Goldsmith, Ph.D., reviewed Green's record and affirmed Dr. Haskins' opinion, with the additional finding that Green could perform 3- to 4-step work tasks in a low stress setting without strict, fast-paced production demands. Tr. 99-101.

### D. Testimonial Evidence

### 1. Green's Testimony

Green was represented by counsel and testified at the administrative hearing, along with an interpreter. Tr. 39-63. He testified that he stopped working because he has six bad discs in his back and the pain had become more and more severe throughout the years. Tr. 45. He also

---

[3] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR, at 34.

had neck surgery, arthritis in his shoulders, and a hard time lifting up his right arm.  Tr. 45.  He also "fell into depression."  Tr. 45.

Initially in his work as a welder at Hosemaster, he was doing big jobs and his back would give out.  Tr. 46.  He then moved to different places within Hosemaster so he could have lighter loads, such as working at a bench operating a machine.  Tr. 46.  He could not sit at a bench for that many hours straight, however, and he would have to get up every 15 minutes, "but then that would hit my back nerve, and I would have to miss a lot of work" because "it would get swollen."  Tr. 46.  The heavy work at Hosemaster required him to lift 50 to 60 pounds and the lighter work required him to lift 10 pounds, but it was continuous and involved getting a lot of things all at once.  Tr. 46.  He also explained that, although the object itself weighed 10 pounds, he would have to elongate that: "You have to lift it up and take it close to you.  And that can weigh 50 or more pounds per hose.  So we have to grab the hose and take it in, and you have to stretch those.  Those are made of stainless steel.  So each one could weigh about 50 or more pounds, and the object weighs 10 pounds."  Tr. 58.  In short, Green was pulling and stretching the hose to get it to the right size, which is how he welded the pipe, and then he would have to weld the fitting around the hose.  Tr. 59.  The stretching was painful to his shoulders.  Tr. 59.  Green stated that he performed the lighter, sitting welding job for about three or four years.  Tr. 47.

When asked what prevented him from working, Green replied, "my lower back, the pinched nerve of the discs that I have there."  Tr. 47.  He also has neck pain on the left side and, though he can move his neck from side to side, he can move it less to the left and he "almost can't" move his neck up.  Tr. 48.  He can look down, but with difficulty.  Tr. 48.  He has pain in both shoulders, although the left side hurts worse than the right.  Tr. 48.  The pain in his shoulder

after injection blocks is about a 5 or 7 out of 10 and without the injections it is 8 or 10 out of 10. Tr. 48.  He cannot use strength or lift his left arm all the way up because it is locked.  Tr. 49.  He cannot lift his arm above his shoulder, but he can lift it to the side and forward.  Tr. 49.  His right arm lost strength and he can no longer hold things for more than 10 seconds.  Tr. 49.  He can lift about 10 pounds with his right hand but cannot keep holding them or hold them up.  Tr. 40. With his left hand he can lift about 25 pounds.  Tr. 50.  He is right-hand dominant.  Tr. 49.

Green also testified that he has difficulty using the fingers of his right hand because "I have autopathy, they're always cramped up."  Tr. 50.  He can use a pencil with his right hand but has difficulty because of the nerves.  Tr. 50.  He is not limited by it but his hand always feels numb.  Tr. 50.  He also feels the same numbness in his right foot.  Tr. 50.  When asked if he could use his hand throughout the day to put things in a box, Green stated, "if it's not heavy.  But I can, the nerves, I have no strength.  It makes me nervous.  Sometimes, things fall off my hands."  Tr. 51.  He stated that this is because his muscle was damaged.  Tr. 51.

Green's back pain causes him to walk "lower, hunch back."  Tr. 51.  He has difficulty walking.  Tr. 51.  He can walk for 15 minutes and then has to sit back down until the pain goes away.  Tr. 51.  This takes about 30 minutes.  Tr. 51.  But then he has to get up because he can only sit about 30 minutes.  Tr. 51-52.  When asked how long he can stand, Green stated, "It's the same thing" and that it is continuous; he explained, "I get up, say, 30 minutes.  I walk around for 30 minutes, then I have to sit back down 15 minutes.  Another 30 minutes, then I'm uncomfortable, I have to get up another 30 minutes."  Tr. 52.  He feels best when he is lying down, which he does three or four times a day for 20 to 30 minutes to stretch his back.  Tr. 52.

Green states that he gets cluster headaches which is like a migraine, "but five times as painful."  Tr. 53.  With a migraine you can get injections but there is no medication for a cluster

headache, only oxygen.  Tr. 53.  He has about 1 or 2 cluster headaches a day that last 7-10 minutes with oxygen and without oxygen he has to be taken to a hospital and they last about an hour.  Tr. 53-54.  He is also depressed and, at one point, "wanted to take my life away."  Tr. 54.  He spends his day "badly," looking at the wall and, sometimes, watching television.  Tr. 54.  He does not do household chores; "My wife does that."  Tr. 54.  He sometimes tries to make meals.  Tr. 54.  It takes him about 30 minutes and he does it twice a week; he does not do it more often because he does not know how to cook very well.  Tr. 55.  Regarding his medications, he is no longer taking oxycontin because it was causing kidney problems so now he is back on Vicodin, which does not help as much.  Tr. 55.  It also makes him sleepy.  Tr. 55.

### 2.  Vocational Expert's Testimony

Vocational Expert ("VE") Debra Lee testified at the hearing.  Tr. 61-67.  The ALJ, Green, and the VE discussed Green's past relevant work as a welder.  Tr. 56-63.  The ALJ asked the VE to determine whether a hypothetical individual of Green's age, education and work experience could perform the work he performed in the past if the individual had the following characteristics: can perform light work; can push and pull occasionally with his right upper extremity and can handle and reach overhead occasionally with his right upper extremity, could occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, and crouch; could never crawl; must avoid all exposure to hazards, defined as industrial machinery, unprotected heights, and similar things; can follow simple instructions and perform simple tasks in a low-stress setting without strict, fast-paced production demands; can maintain superficial relationships with co-workers, supervisors, and the general public; can have occasional interaction with the general public; can work in a relatively static setting without frequent or significant changes in job duties, and can perform work that does not require more

than basic English communication.  Tr. 64.  The VE answered that such an individual could not perform Green's past relevant work, explaining, "The past work was not simple.  It would have also required more than an occasional push/pull with the right upper extremity.  And I do believe it probably had fast-paced, or at least fast-paced or strict production demands."  Tr. 65.  The ALJ asked if such an individual could perform any work and the VE answered that such an individual could perform work as a cleaner, housekeeping (3,000 regional jobs; 8,700 Ohio jobs; 278,000 national jobs), cafeteria attendant (600 regional jobs; 1,800 Ohio jobs; 61,000 national jobs), and inspector or hand packager (2,400 [sic] regional jobs; 1,600 Ohio jobs; 311,000 national jobs). Tr. 65.

Next, Green's attorney asked the VE whether the hypothetical individual could perform the jobs identified by the VE if the individual had the following, additional characteristics: could only stand or walk for two hours; must change position every 30 minutes; and would need a five-minute break every 30 minutes.  Tr. 66.  The VE answered that the limitation regarding standing and walking alone would eliminate light work.  Tr. 66.  Green's attorney then asked if there would be any sedentary jobs that the individual could perform with those restrictions and the VE answered that there would be no jobs because, for ten minutes every hour, the individual would be taking a break and this limitation would preclude small, simple assembly jobs that have production requirements.  Tr. 66.  Green's attorney asked the VE if there were jobs the individual could perform if the individual would be off-task for 25% of the day and the VE answered no.  Tr. 67.  Lastly, Green's attorney asked the VE how she interpreted the limitation "no greater than basic English communication" in the ALJ's hypothetical and the VE answered that she was looking for jobs that, generally, did not require talking with the general public.  Tr. 67.  Green's attorney stated that he did not know what "basic" meant in this regard and the VE

explained that she has worked with individuals who cannot speak English but they can perform jobs because they can be shown the tasks to be performed.  Tr. 68.  She stated that it does not require an accommodation from the employer because, "once you show them how to do it, they can do the job.  And so you're not constantly accommodating them for that language usage. Because language is not ... a specific requirement of the job."  Tr. 68.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her April 2, 2015, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.  Tr. 22.

2.      The claimant has not engaged in substantial gainful activity since February 23, 2013, the alleged onset date.  Tr. 22.

3.      The claimant has the following severe impairments: degenerative disc disease, degenerative joint disease, diabetes mellitus, hypertension, hyperlipidemia, cluster headaches, carpal tunnel syndrome-status post release surgery, obstructive sleep apnea, obesity, an affective disorder and an anxiety disorder.  Tr. 22.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 22.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5.      The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §404.1567(b) and §416.967(b) except [he] can push and pull occasionally with the right upper extremity, handle and reach over[]head occasionally with the right upper extremity, can climb ramps and stairs occasionally, never climb ladders, ropes, and scaffolds, can occasionally balance, stoop, kneel and crouch, could never crawl, must avoid all exposure to hazards defined as industrial machinery and unprotected heights, can follow simple instructions, can perform simple tasks in a low stress setting, without strict fast-pace production demands, can maintain superficial relationships with co-workers, supervisors and the general public, can interact occasionally with the general public, can work in a relatively static setting without frequent or significant changes in job duties, and can perform work that does not require more than basic English language communication.  Tr. 24.

6.      The claimant is unable to perform any past relevant work.  Tr. 30.

7.      The claimant was born on August 11, 1964 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 30.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 30.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 30.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 30.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 23, 2013, through the date of this decision. Tr. 31.

## V. Parties' Arguments

Green objects to the ALJ's decision on two grounds.  He argues that the weight that the ALJ gave to the treating source opinions of Drs. Van Auken and Vasquez and the opinion of consultative examiner Dr. House was not supported by substantial evidence.  Doc. 15, pp. 13-19.

He also contends that the ALJ failed to evaluate the VE's testimony regarding the "handling" limitation.  Doc. 15, pp. 19-20.  In response, the Commissioner submits that the ALJ properly considered the opinion evidence and properly relied on the VE's testimony.  Doc. 18, pp. 4-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ erred when she considered the opinion of treating physician Dr. Van Auken

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider

factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Dr. Van Auken provided two opinions, the first in August 2013 and the second in December 2014. Tr. 503-504, 845-850. As to the August 2013 opinion, the ALJ explained,

> In August 2013, only 1 month after the claimant had his cervical fusion surgery performed, Dr. Van Auken provided a MSS. Dr. Van Auken opined that the claimant must change positions every 30 minutes or less, that he can stand and walk for 2 hours of an 8-hour day and that the claimant can lift almost no weight. Additionally, the doctor indicated the claimant would require unscheduled breaks every 20 minutes or less and that the claimant is unable to perform any "physical workplace activities[.]" As reference above, these opinions were made when the claimant was approximately one-month post cervical fusion surgery. For that reason, they cannot represent an accurate picture of the claimant, as the evidence shows the claimant recovered from this surgery. Dr. Van Auken also fails to define duration for the alleged restrictions and uses vague terms in making the statement that the claimant cannot perform "physical" activities. Such a vague and imprecise statement is not probative of the claimant's functional level. His conclusion that the claimant is disabled is reserved to the Commissioner. An office visit from the same date as the August MSS found that the claimant was doing "okay" and was encouraged to walk and exercise. These opinions therefore were only give some weight as the objective evidence shows they do not portray a wholly accurate functional picture.

Tr. 29 (citations to the record omitted). Here, the ALJ found Dr. Van Auken's first opinion to be inconsistent with other substantial evidence in the record and unsupported by Dr. Van Auken's own treatment notes. *Wilson*, 378 F.3d at 544; 20 C.F.R. § 416.927(c). The ALJ also described good reasons that were sufficiently specific to make clear to the Court the reasons for the weight she gave to Dr. Van Auken's opinion: the opinion was vague and unspecific as to Green's functional level; it did not include a durational aspect and was rendered only one month after Green's fusion surgery; and it included a conclusion that is reserved to the Commissioner. *See Wilson*, 378 F.3d at 544 (an ALJ must give "good reasons" for describing the weight given to a treating source opinion that are sufficiently specific to make clear to any subsequent reviewers

the weight given to the treating physician's opinion and the reasons for that weight.).  Green does

not make specific arguments to the contrary with respect to Dr. Van Auken's August 2013

opinion.  The ALJ did not err in assigning weight to this opinion.

      The ALJ continued,

> In December 2014 Dr. Van Auken provided another MSS opining that the claimant could
> only lift and carry up to 10 pounds occasionally and could only handle, grasp and finger
> occasionally. He also indicated the claimant could stand and walk for 1 hour per day and
> sit for 2 hours.  He opined the claimant would requires 2 to 4 unscheduled breaks during
> the day of 15 to 20 minutes due to his cluster headaches, back and shoulder pain.  Dr.
> Van Auken concluded that the claimant would be "off-task" more than 25% of a workday
> and that the claimant could not work due to poor balance and strength as well as gait
> difficulty, noting that the claimant had to leave his job in 2013 (11F/1-3).  The
> undersigned gives these opinions limited weight as Dr. Van Auken's treatment records
> show the claimant to be ambulating without difficulty, with normal grip strength and
> normal range of motion in the shoulders in the visits prior to his opinion being rendered
> (10F/27, 34, 36).  Dr. Van Auken seems to place some credence on the fact that the
> claimant was forced to leave his job in 2013, but the claimant's ability to do his past
> relevant work is not dispositive.  As the objective medical evidence (including Dr. Van
> Auken's own contemporaneous physical exams) does not support his opinions, they are
> given little weight.

Tr. 29.  Here, again, the ALJ explained that Dr. Van Auken's second opinion was inconsistent

with other substantial evidence in the record and unsupported by his own treatment notes.

      The problem with the ALJ's analysis of the December 2014 opinion, as Green points out,

is that the treatment notes that the ALJ ascribes to Dr. Van Auken—"10F/27, 34, 36"—are not

Dr. Van Auken's treatment notes.  Instead, they are treatment notes from Dr. Ballou dated

January 28, 2014 (Tr. 641), Dr. Songquian dated March 3, 2014 (Tr. 648), and Dr. Ballou again

on March 3, 2014 (Tr. 650).  And the ALJ specifically references that these treatment notes were

"prior to [Van Auken's] opinion being rendered," yet the most contemporaneous treatment note

from Van Auken relevant to his opinion date of December 2014 was from a visit on October 11,

2014, wherein he observed Green to have reduced range of motion in his neck at all planes,

especially neck extension; decreased range of motion in his right upper extremity; low back

tension at his paraspinal muscles; and a "careful but steady" gait.  Tr. 828.  Thus, the primary

reason that the ALJ expressed for discounting Dr. Van Auken's opinion, i.e., its inconsistency

with Dr. Van Auken's own treatment notes prior to the opinion date, was erroneous and,

therefore, not supported by substantial evidence.  As a result, remand is warranted.

### B. The ALJ did not err when she considered the opinions of consultative examiner Dr. House and treating psychiatrist Dr. Vasquez

Green argues that the ALJ also erred when discussing the opinions of Dr. House, a

consultative examiner, and Dr. Vasquez, Green's treating psychiatrist.  The Court disagrees.  The

ALJ accurately stated that Dr. House's extreme statement that Green "would be disruptive and

dysfunctional in a work environment" was "wholly unsupported" by Dr. House's own

examination notes after a one-time visit and the evidence in the record.  Tr. 28.  *See* 20 C.F.R. §

416.927(c) (in deciding the weight given, the ALJ considers factors such as the length, nature,

and extent of the treatment relationship; the supportability of the opinion; and the consistency of

the opinion with the record as a whole).  That Dr. House observed Green to have no more than a

moderate limitation in his ability to concentrate and did not have a history of negative interaction

with others does not support his extreme opinion that Green would be disruptive but, rather,

negates it.

With respect to Dr. Vasquez's opinion, the ALJ gave it "some" weight, but noted that

Vasquez's  opinion that Green would be off-task 25% of the workday and absent 10 days a

month was "speculative, based on a very short treating relationship in which the claimant has

largely been untreated."  Tr. 29.  Dr. Vasquez saw Green once, the day that he filled out the

mental RFC assessment.  The ALJ also observed that Dr. Vasquez's opinion that Green is

markedly limited in social functioning and extremely limited in his ability to complete activities

on a schedule was undermined by the fact that Green has interacted appropriately with all

medical providers and maintained commendable attendance at doctors' appointments.  Noting that the aforesaid is not dispositive of the issue, the ALJ emphasized that there is no support in the record for the Dr. Vasquez's severe limitations.  *See* 20 C.F.R. § 416.927(c).  That Dr. Vasquez's opinion regarding the severity of Green's limitations is similar to Dr. House's, whose opinion was contrary to his own notes and also unsupported by the record, does not save Dr. Vasquez's opinion.  The ALJ did not err with respect to her treatment of the opinions of Drs. House and Vasquez.

### C. Green's argument regarding the VE's testimony

Green argues that the ALJ "should have found that the jobs identified by the vocational expert fall outside the parameters of the hypothetical question."  Doc. 15, p. 19.  He points out that the ALJ asked the VE to consider an individual who can perform light work and has the ability to "handle and reach overhead occasionally with the right upper extremity" and that, in response, the VE identified jobs such an individual could perform: cleaner/housekeeper, cafeteria attendant and hand packager.  Doc. 15, p. 20.  Green submits that these jobs require a significant amount of handling and that the ALJ should have "consider[ed] the reliability of the [VE's] testimony when finding that Mr. Green is capable of performing a significant number of jobs."  Doc. 15, p. 20.  In response, the Commissioner contends that an ALJ is not required to investigate the accuracy of the VE's testimony.  Doc. 18, p. 12.  She also points out that Green did not cross examine the VE at the hearing about this issue and that any argument regarding the VE's answer is waived.  Doc. 18, p. 12.

The Court does not address Green's argument because, on remand, the ALJ's evaluation of Dr. Van Auken's opinion may impact her findings with respect to Green's RFC and the Commissioner will have an opportunity to obtain information from the VE.  *See Gresham v.*

*Comm'r of Soc. Sec.*, 2014 WL 3749375, at *11 (N.D.Ohio July 30, 2014) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's determination might impact her findings).

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Dated: June 13, 2016

Kathleen B. Burke
United States Magistrate Judge